UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------------------   x
M.S., a minor by his Next Friend,                                     :
CLEANTE STENOR, CLE                                                   :
                                                                     :
                                          Petitioner,                 :        **MEMORANDUM &**
                                                                     :        **ORDER**
            -against-                                                 :
                                                                     :        3:25-CV-02170 (VDO)
ANGIE SALAZAR, ET AL.                                                 :
                                                                     :
                                          Defendant(s).               :
-------------------------------------------------------------------   x

**VERNON D. OLIVER**, United States District Judge:

Petitioner, a thirteen-year-old child, has been detained by the Office of Refugee

Resettlement ("ORR") for almost 500 days. Before the Court is his Motion for Temporary

Restraining Order and Preliminary Injunction (the "Motion") (ECF No. 18), seeking his release

from ORR detention into the custody of Cleante Stenor, his next friend. For the following

reasons, the Court **GRANTS** the Motion.

I.     **BACKGROUND**

       A.     **Factual Background**

The following facts are from the habeas petition, the Motion, affidavits submitted by

both parties, and the Certified Administrative Record ("CAR"). [1] *See Doe v. Franklin Square*

*Union Free Sch. Dist.*, 568 F. Supp. 3d 270, 282 (E.D.N.Y. 2021) ("In deciding a motion for

preliminary injunction, a court may consider the entire record including affidavits and other

hearsay evidence.") (cleaned up).

---

[1] In reciting facts from the CAR, the Court references the pagination on the bottom right-hand
corner of the record, as opposed to the CM/ECF pagination.

### 1.    M.S.'s Background

Petitioner is a citizen of Haiti who was initially detained by the U.S. Department of Homeland Security ("DHS") on September 25, 2024.[2] From the ages of three months to three years, M.S. was raised by Cleante Stenor, his next friend, and her husband, Duronel Stenor (collectively, the "Stenors").[3] Petitioner's biological mother died when he was three months old, and until recently, he believed Mr. Stenor was his biological father.[4] After Petitioner's biological mother passed, the Stenors took him in and raised him alongside their four biological children.[5] This lasted for approximately three years, until 2015, when Mr. and Ms. Stenor, along with their youngest biological child, left Haiti for economic opportunities in other countries.[6] Although the Stenors were not physically present, they maintained constant phone and video contact with the children.[7] They made sure the children kept up with their schoolwork, attended church, and handled their responsibilities in the home.[8]

Facing targeted gang violence and political upheaval, Petitioner and the Stenors' three oldest children left Haiti in 2024 to reunite with the Stenors in Florida.[9] Mr. Stenor organized and paid for the children's journey to the United States.[10] The children traveled together and

---

[2] CAR 55.

[3] Cleante Stenor Aff., ECF No. 21-2 ¶ 5.

[4] CAR 328.

[5] ECF No. 21-2 ¶ 5.

[6] *Id.* ¶ 11.

[7] CAR 756.

[8] ECF No. 21-2 ¶ 12.

[9] M.S. Aff., ECF No. 21-1 ¶ 4; *see also* CAR 163.

[10] CAR 758, 1541.

sought entry to the United States at the San Ysidro Port of Entry in San Ysidro, California.[11] Petitioner and two of the Stenors' biological children were permitted entry, while the third biological child remained in Mexico because she was older than eighteen and thus ineligible for the same permission for entry.[12] Upon entry, Petitioner was designated an "Unaccompanied Alien Child" ("UAC") and was transferred into ORR custody.[13] ORR placed Petitioner in short-term foster care with New Life Foster Family Agency ("NLFFA") in California. In July 2025, ORR transferred Petitioner to a long-term foster care program in Connecticut run by the Children's Community Programs of Connecticut ("CCP").[14]

### 2.    Sponsorship Applications

Sponsors seeking the release of a child from ORR custody must submit to an extensive verification process to evaluate whether the sponsor is capable of providing for the child's wellbeing. *See* 45 C.F.R. § 410.1202. The application process requires potential sponsors to submit documents verifying their identities and addresses, as well as proof of income, and proof of the sponsor-child relationship. *See* ORR Unaccompanied Alien Children Bureau Policy Guide ("UACB Policy Guide") § 2.1.  The process may also require home studies, fingerprinting, DNA testing, and the submission of photographs of family members. *Id.*

Over the course of more than a year, the Stenors submitted three separate sponsorship applications seeking Petitioner's release from ORR custody. The Stenors complied with ORR's directives by undergoing DNA testing, submitting themselves to repeated home

---

[11] *Id.* at 55.

[12] ECF No. 21-2 ¶ 13.

[13] CAR 5–8.

[14] *Id.* at 605.

studies, attending family counseling sessions, providing their fingerprints and personal identification documents, and providing photographs of their family.

These efforts were sufficient to release Ms. Stenor's biological children into her custody, but to date, Petitioner remains detained by ORR. The Stenors withdrew the first two applications when it became clear that their applications would likely be denied. ORR denied the third application through a phone call to Ms. Stenor. The details of each application process are outlined below.

### a.    First Sponsorship Application

Mr. Stenor was identified by NLFFA as a Category 1 sponsor for Petitioner soon after Petitioner entered the United States.[15] At the time, as mentioned, Petitioner, Mr. Stenor, and the rest of the Stenor family all thought that Mr. Stenor was Petitioner's biological father. Days later, on September 30, 2024, Mr. Stenor disclosed that his wife, Ms. Stenor, was not Petitioner's biological mother.[16] NLFFA flagged this as an issue in the application, as Petitioner's birth certificate listed Ms. Stenor as his biological mother. NLFFA sent Petitioner's birth certificate to a translator, and the translator flagged the birth certificate as suspicious.[17] Petitioner entered the program with the birth certificate, as he had traveled with

---

[15] Under ORR sub-regulatory policy guidance, there are four categories of potential sponsors: Category 1, consisting of parents and legal guardians; (2) Category 2A, consisting of siblings, half-siblings, grandparents, or immediate relatives who previously served as primary caregivers; (3) Category 2B, consisting of immediate relatives who did not serve as primary caregivers; (4) Category 3, consisting of other sponsors such as distant relatives and unrelated adults. *See ORR UACB Policy Guide* ("ORR Policy Guide"), § 2.2.1.

[16] CAR 754.

[17] *Id.*

4

it from Mexico.[18] Indeed, ORR has explicitly identified that the "sponsor did not provide the original [incorrect] birth certificate, child arrived to the facility with this certificate."[19] The Stenors explained to ORR that the incorrect birth certificate came into Petitioner's possession through a non-profit agency in Mexico that helped the children gain admission to the United States.[20] Petitioner did not have a birth certificate when he arrived in Mexico.[21] Accordingly, Mr. Stenor reached out to a friend in the Haitian government to obtain Petitioner's birth certificate. Mr. Stenor then forwarded that birth certificate to the non-profit agency, and the non-profit agency gave it to Petitioner.[22] The Stenors later provided ORR with a second birth certificate, which lists Mr. Stenor as Petitioner's father and Rositta Pierre as the Petitioner's mother.[23]

Given the initial discrepancy in Petitioner's birth certificate, NLFFA submitted a request for DNA testing to verify the relationship between Mr. Stenor and Petitioner. On or about November 20, 2024, the DNA results were returned with a 0% match for Petitioner and Mr. Stenor—indicating that Mr. Stenor was not Petitioner's biological father.[24] Before NLFFA revealed the DNA results, both Petitioner and Mr. Stenor believed that Mr. Stenor was Petitioner's biological father.[25] Learning otherwise shocked both parties, although Mr. Stenor

---

[18] *Id.* at 755.

[19] *Id.* at 786.

[20] *Id.* at 2100.

[21] *Id.*

[22] *Id.*

[23] *See id.* at 932.

[24] *Id.* at 328.

[25] *Id.*

immediately stated that "[Petitioner] will always be his son as he has taken care of him all his life."[26]

Because of the DNA test finding no match between Mr. Stenor and Petitioner, ORR recategorized Mr. Stenor as a Category 3 sponsor.[27] Non-biological, Category 3 sponsors are subject to heightened ORR screening requirements, such as home studies and a requirement to prove a relationship. *See* UACB Policy Guide § 2.2.4.  Category 3 sponsors are also denied the internal ORR appeal process afforded to all other categories of sponsors. Nevertheless, immediately after learning of the negative DNA test, Mr. Stenor expressed desire to continue with the sponsorship application process, and NLFFA scheduled a home study.[28]

During the home study, an ORR investigator reported Mr. Stenor to Child Protective Services ("CPS") based on allegations of physical discipline. However, CPS refused to entertain the investigation and rejected the case.[29] Nevertheless, the home study concluded with a negative recommendation.[30] Further, throughout this time, Mr. Stenor expressed frustrations and anger about the sponsorship process, and communications with NLFFA broke down. Specifically, he was distraught and "felt that the program was keeping his children," as Petitioner and two of the Stenors' biological children were all in ORR custody at the time.[31] Because of the negative home study and the breakdown in communications, NLFFA

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.* at 791.

[30] *Id.*

[31] *Id.* at 788.

6

encouraged Mr. Stenor to withdraw his sponsorship application. Following NLFFA's advice, Mr. Stenor withdrew his application on January 8, 2025.[32]

### b.    Second Sponsorship Application

In January 2025, after Mr. Stenor withdrew his application, Ms. Stenor submitted a sponsorship application and began the family reunification process.[33] She completed a Family Reunification Application, Authorization for Release of Information, Child Abuse and Neglect checks, provided her photo identification and proof of address, participated in a Sponsorship Assessment Interview, and completed multiple family sessions with Petitioner and NLFFA.[34] ORR also completed multiple home studies, all of which returned with positive recommendations.[35]

During the family sessions, a NLFFA clinician regularly noted the positive interactions between Ms. Stenor and Petitioner. The clinician found that Petitioner and Ms. Stenor "present a respectful and familial relationship"[36] and that there is nothing "significant that may impede [Petitioner] and [Ms. Stenor] from being reunified at this time."[37] Both parties recalled shared memories from Petitioner's childhood.[38] Ms. Stenor would conclude the sessions by encouraging him to behave, attend to his school work, and read his Bible.[39] Petitioner

---

[32] *Id.*

[33] ECF No. 21-2 ¶ 19.

[34] *Id.*; *see generally* CAR 1330–1380.

[35] CAR 758.

[36] *Id.* at 1352–53, 1356.

[37] *Id.* at 1362.

[38] *Id.* at 1355–56.

[39] *Id.*

repeatedly expressed his desire to be reunified with Ms. Stenor.[40] And he acknowledged that he feels safe and comfortable going to live with her.[41]

During this application process, ORR contacted Petitioner's biological, maternal aunt, who stated that she believed Mr. Stenor was Petitioner's biological father.[42] She expressed that she and her family felt comfortable with Mr. Stenor taking care of Petitioner because "he is the father and he took good care of her sister, [Petitioner's biological mother], before during, and after the pregnancy."[43] Petitioner's aunt also confirmed that the family could not afford to register the death of Petitioner's biological mother.[44] Thus, Petitioner's aunt indicated that she does not have a death certificate for his biological mother, and one likely does not exist.[45]

ORR also contacted Ms. Stenor's eldest biological daughter, in Mexico, to corroborate Petitioner's childhood and journey to the United States.[46] Her daughter provided a picture of her ID and a selfie to prove her identity.[47] She was able to confirm and independently corroborate information provided by Ms. Stenor and Petitioner.[48]

---

[40] *Id.* at 1355–56, 1365.

[41] *Id.* at 1353.

[42] *Id.* at 757.

[43] *Id.*

[44] *Id.* at 224.

[45] *Id.* at 226.

[46] *Id.* at 2068.

[47] *Id.* at 2069.

[48] *Id.*

Separately, in April 2025, Cleante Stenor was approved as a Category 1 sponsor for her two biological children who entered the United States with Petitioner. The children were promptly released to her.[49]

In May 2025, Petitioner's NLFFA case manager recommended Petitioner's release to Ms. Stenor's custody.[50] The ORR case coordinator disagreed, and recommended denial because the Stenors did not have a photo ID for one of their recently released children and could not provide a death certificate for Petitioner's biological mother.[51] Accordingly, NLFFA informed the Stenors that Petitioner was not going to be released from ORR custody and repeatedly instructed Ms. Stenor to withdraw her sponsorship application so Petitioner could be transferred to a long-term foster care program.[52] NLFFA informed Ms. Stenor that her application had to either be withdrawn or that it would be denied.[53] On May 27, 2025, the NLFFA case manager wrote Cleante Stenor a sponsorship withdrawal letter to sign and return. Believing it was in the best interest of Petitioner, Cleante Stenor returned the signed letter, withdrawing the second sponsorship application that had been filed on Petitioner's behalf.[54]

### c.    Third Sponsorship Application

Upon the withdrawal of Ms. Stenor's sponsorship application, ORR transferred Petitioner to a long-term foster care program in Connecticut run by the Children's Community

---

[49] ECF No. 21-2 ¶ 20.

[50] CAR 757.

[51] *Id.*

[52] ECF No. 21-2 ¶ 23.

[53] *Id.*; *see* CAR 757.

[54] ECF No. 21-2 ¶ 23; CAR 758.

Programs of Connecticut ("CCP").[55] Upon his transfer to CCP, Petitioner began working with Tess Reagan, who is an attorney with Kids in Need of Defense ("KIND").[56] ORR also appointed Petitioner a Child Advocate, attorney Victoria Canales, through the Young Center for Immigrant Children's Rights.[57]

In August 2025, Ms. Stenor began working with VECINA, an immigrant's rights organization, to obtain counsel so that she could continue her efforts to sponsor Petitioner. VECINA connected Cleante Stenor with attorney Dawn Burns.[58] That same month, Attorney Burns submitted a request to reopen Cleante Stenor's sponsorship application.[59] The application was assigned to a "unification specialist" through the Providencia Gorup ("TPG") who, at the time, contracted with ORR to gather sponsor information and applications.[60] Ms. Stenor then submitted her identification, background checks for her and all other household members, proof of address, the authorization for release of information form, her marriage certificate, proof of relationship with pictures, and school documents for her other children.[61]

However, around the end of September 2025, TPG's contract was terminated and the "unification specialist" was removed from the application process.[62] Instead, CCP informed KIND that Petitioner's sponsorship application would now be handled by DSA Federal Field

---

[55] CAR 2102.

[56] *Id.*

[57] *Id.* at 2101.

[58] ECF No. 21-3 ¶ 50–51

[59] *Id.*

[60] *Id.* ¶ 52.

[61] Notice, ECF No. 79 at 3; *see also* CAR 2516–17.

[62] ECF No. 21-3 ¶¶ 57–58.

Specialist ("FFS") Ricardo Rivera. Attorney Reagan called FFS Rivera to confirm that the process would not start anew and to request an expeditious decision on Petitioner's case. She received no response. [63]

On September 30, 2025, Attorney Reagan submitted a request with the UAC Office of the Ombuds. The office confirmed receipt but provided no further updates.[64]

On October 8, 2025, Attorney Burns and Ms. Stenor spoke with FFS Rivera, who could not provide a timeline on the sponsorship application.[65]

On November 13, 2025, Attorney Reagan emailed FFS Rivera, along with other FFS agents, supervisors, the Legal Affairs Team, the Division of Policy Administration at ORR, and ORR's Regulatory and Compliance Counsel. Her email expressed concerns about Petitioner's prolonged detention. She did not receive a reply to the email.[66]

On November 14, 2025, CCP Case Manager Aliz Quinones generated a form titled "ORR Notification to ICE Chief Counsel Release of Unaccompanied Alien Child to Sponsor and Request to Change Address."[67] The document states, "ORR has determined that the below Juvenile Respondent should be released to a sponsor," and then proceeds to list Ms. Stenor as Petitioner's new custodian. [68]

---

[63] *Id.*

[64] *Id.* ¶ 59.

[65] *Id.* ¶ 60.

[66] *Id.* ¶ 62

[67] CAR 2521.

[68] *Id.*

Yet, later that same day, Attorney Reagan received an email stating that FFS Rivera submitted a "Sponsor Recommendation Denial." Subsequent emails stated that the reason for the denial was "unmitigated concerns around fraudulent documents," referring to the fraudulent birth certificate Petitioner had when he entered the United States.[69]

On November 20, 2025, the CCP case manager called Ms. Stenor and informed her of the denial. She stated the reasons for denial were (1) the fraudulent birth certificate; (2) the lack of strong evidence of a familial relationship between Petitioner and Ms. Stenor; and (3) that Ms. Stenor never provided a death certificate for Petitioner's biological mother.[70] Before informing Petitioner of the denial, the case manager worked with Petitioner's clinician to enact a safety plan to ensure his wellbeing after he received the news. The next day, on November 21, 2025, the case manager met with Petitioner in private to inform him of the denial. He was distraught by the news and asked why he would not be reunited with his family.[71]

Petitioner remains in ORR custody to date. His behavior has changed due to this prolonged period in ORR custody. He demonstrates disruptive behavior in school and frequently expresses loneliness and boredom.[72] He has begun showing indicators of depression and is unenthusiastic when participating in activities.[73] He distrusts CCP staff, the program, and expresses a constant desire to be reunified with his family.[74]

---

[69] ECF No. 21-3 ¶ 63.

[70] CAR 2161.

[71] CAR 2325.

[72] ECF No. 79 at 4.

[73] *Id.*

[74] *Id.*

## II.    LEGAL STANDARD

A motion for a temporary restraining order (TRO) is "an extraordinary and drastic remedy." *Students for Fair Admissions v. U.S. Mil. Acad. W. Point*, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)); *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam). It is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

"In the Second Circuit, the standard for issuing a TRO is the same as the standard for the issuance of a preliminary injunction." *Fairfield Cty. Med. Ass'n v. United Healthcare of New England*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd as modified sub nom.,* 557 F. App'x 53 (2d Cir. 2014). A party seeking a TRO or preliminary injunction that "will affect government action taken in the public interest pursuant to statute or a regulatory scheme" must demonstrate: (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, (3) public interest weighing in favor of granting the injunction, and (4) that the balance of equities tips in its favor. *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279–80 (2d Cir. 2021), *opinion clarified* 17 F.4th 368 (2d Cir. 2021); *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020). The final two factors for injunctive relief—the balance of hardships and public interest— "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also, e.g., New York v. DHS*, 969 F.3d 42, 58-59 (2d Cir. 2020).

## III.    DISCUSSION

The Court now turns to whether a TRO and preliminary injunction is warranted. As discussed below, the Court concludes that all factors weigh in favor of Petitioner and accordingly **GRANTS** the Motion.

A.    **Likelihood of Success on the Merits**.

Petitioner is likely to succeed on the merits of his Administrative Procedures Act ("APA") claim, as explained below.[75] Broadly, Petitioner asserts that ORR's final decision to reject Ms. Stenor's sponsorship application was arbitrary and capricious because it failed to consider "the best interests of the child," as required by ORR's regulations. *See* 45 C.F.R. § 410.1205(a). "In general, to establish a 'likelihood of success on the merits' the movant for injunctive relief 'need only make a showing that the probability of his prevailing is better than fifty percent.'" *Abrams v. Waters*, No. 17-CV-1659 (CSH), 2018 WL 1469057, at *4 (D. Conn. Mar. 26, 2018) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)).

1.    **APA: Standing**

As an initial matter, the Court has standing to review the APA claim because ORR's denial of Ms. Stenor's sponsorship application was a final agency action. Under the APA, "courts may not review agency actions unless such actions are final." *Shakhnes v. Berlin*, 689 F.3d 244, 260 (2d Cir. 2012) A final agency action is one that is "a consummation of the agency's decision process," and the action "must be one by which rights and obligations have been determined, or from which legal consequences will flow." *Williams v. Smith*, No. 3:22-CV-1630 (SVN), 2024 WL 3292725, at *14 (D. Conn. July 3, 2024) (quoting *Paskar v. U.S. Dep't of Transp.*, 714 F.3d 90, 96 (2d Cir. 2013)). As a Category 3 sponsor, Ms. Stenor was not permitted to appeal the decision internally through the ORR appellate process. Accordingly, the ORR decision denying sponsorship was final, and a court action is her only avenue for relief. Neither party contests this determination.

---

[75] Because the Court finds Petitioner is likely to succeed on this claim, it finds it unnecessary to take up the issue of whether he is likely to succeed on the merits of his other causes of action.

14

### 2.    APA: Merits

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). ORR has a statutory mandate to "promptly" place an unaccompanied child "in the least restrictive setting that is in the best interests of the child." Further, under the Unaccompanied Children Program Foundational Rule ("Foundational Rule"), as codified at 45 C.F.R. 410, ORR is required to "release a child from its custody without unnecessary delay" after determining sponsor suitability, and that the detention of the child is not required to secure the child's appearance before DHS, or to "ensure the child's safety or that of others." 45 C.F.R. § 410.1201.

After careful consideration, the Court concludes that each reason ORR provided for denying Ms. Stenor's application was arbitrary, capricious, and antithetical to Petitioner's best interests.

### a.    UACB Policy Guide § 2.7.4.

ORR contends that the core reason for denying Mr. Stenor's application was the false birth certificate Petitioner entered the country with, which erroneously listed the Stenors as Petitioner's biological parents.[76] ORR indicates that as a Category 3 sponsor, the false birth certificate disqualified Ms. Stenor from sponsorship under UACB Policy Guide § 2.7.4, which states in relevant part that ORR "will deny release" to a Category 3 sponsor if "the potential sponsor or a member of the potential sponsor's household . . . [h]as knowingly provided false information, committed perjury, or submitted fraudulent documentation during the sponsor

---

[76] Biswas Aff., ECF No. 72-1 ¶ 31.

assessment process." UACB Policy Guide § 2.7.4. However, the UACB Policy Guide also

provides for case-by-case exceptions to this demanding requirement, stating that:

> ORR will deny release if it is determined that fraudulent documents were submitted during the sponsorship application process, regardless of sponsor category. Exceptions will only be made on a case-by-case basis and must be supported by clear justification and through documentation.

UACB Policy Guide § 2.2.4.

This exception policy is necessary to ORR's adjudication of sponsorship applications

because a bright-line rule mandating rejections of sponsors based solely on an inaccurate

document would inherently prevent ORR from considering the best interests of the child. This

is particularly true in situations such as this one where ORR's own officials have repeatedly

found a loving, respectful, and de-facto family relationship between a sponsor and an

unaccompanied child. Of course, the Government has a significant interest in mandating the

safety of children in its care, which is why they require thorough documentation and a "clear

justification" when allowing an exception to the fraudulent document rule.

Here, ORR repeatedly found that Ms. Stenor was a suitable sponsor, absent the

inaccurate birth certificate. Most notably, ORR approved her as a Category 1 sponsor for her

biological children and released them into her custody nearly a year ago. In doing so, ORR

found that Ms. Stenor was capable of providing for their safety and wellbeing. Further, ORR

officials have never found that Petitioner was at risk of abuse, trafficking, or neglect. In fact,

they've found quite the opposite. ORR officials have consistently reported that Ms. Stenor and

Petitioner display a loving, "mother-son" relationship, based in mutual respect and care.

Indeed, Petitioner's NLFFA case manager recommended approving Ms. Stenor's sponsorship

application.  And Petitioner's CCP case manager went as far as to generate a form titled "ORR

16

Notification to ICE Chief Counsel Release of Unaccompanied Alien Child to Sponsor and Request to Change Address," which listed Ms. Stenor as Petitioner's new custodian.

ORR's failure to consider an exception in this circumstance is arbitrary and capricious because it had spent more than a year, over the course of three applications, ruling out any possible concerns for Petitioner's safety or wellbeing. By issuing an abject denial of Ms. Stenor's sponsorship application without considering an exception, ORR failed to abide by its own guidelines and the requirement that it foremost consider the child's best interests in determining placement.  ORR has not expressed any concerns about Petitioner's safety with Ms. Stenor, nor have they expressed that she lacks the ability to provide for his care. Accordingly, ORR's failure to exercise its discretion to was arbitrary and capricious.

### b.    Familial Relationship

Next, ORR states it denied the sponsorship application because Ms. Stenor could not provide documentation of a preexisting social relationship with Petitioner. This fundamentally ignores the repeated findings of ORR's own officials who stated that Petitioner and M.S. had a respectful, family relationship. It also contradicts ORR's own records, which show that ORR agents conducted extensive family sessions and obtained accounts corroborating the relationship between Petitioner and Ms. Stenor. ORR's records describe the relationship between them as a mother-son relationship with a strong pre-existing bond.[77] Accordingly, ORR's denial of Ms. Stenor's sponsorship application on the basis that there was not a preexisting social relationship with Petitioner was arbitrary and capricious because it directly contradicts ORR's own record and findings as to their relationship.

---

[77] CAR 2516.

### c.    Death Certificate

Finally, ORR claims it denied the sponsorship application because Ms. Stenor could not provide a death certificate for Rositta Pierre, Petitioner's biological mother. The Court cannot discern why this requirement was placed on Ms. Stenor, or why it was a basis for the ultimate denial of her sponsorship application. The UACB Policy Guide makes no mention of the requirement for a death certificate to proceed with Category 3 sponsorship. Further, ORR had the assurance of Rositta Pierre's sister that no such death certificate existed. That assurance stemmed not because Petitioner's biological mother was still alive, but because the family could not afford to report her death—an essential prerequisite for the existence of a death certificate. Further, even if one did exist, it is unclear how Ms. Stenor—a person entirely unrelated to Rositta Pierre—was supposed to obtain this death certificate from a Haitian agency. Indeed, the United States government was not able to obtain one when they inquired.

ORR's decision to deny Ms. Stenor's sponsorship did not consider the practicality of obtaining the death certificate. The government had confirmation of Rositta Pierre's death from her sister, Petitioner's biological aunt. Instead of relying on this information, ORR asked Ms. Stenor to obtain a document they knew did not exist. Then it denied her application because she could not achieve this impossible feat. Further, ORR's own policies did not require a death certificate, and ORR had already obtained the information it sought—namely, confirmation of the death of Petitioner's biological mother. Accordingly, ORR's decision to deny Ms. Stenor's application because she failed to provide Rositta Pierre's death certificate was arbitrary and capricious.

18

**B.    Irreparable Harm, Balance of the Equities, and the Public Interest**

Having found that Petitioner is likely to succeed on the merits of his claim, the Court easily finds that he has satisfied the remaining factors required for injunctive relief. First, "there is no question that unlawful detention causes irreparable harm: indeed, every minute that someone is unlawfully denied freedom results in an injury that really can never be remedied." *Alvarez Ortiz v. Freden*, No. 25-CV-960-LJV, 2025 WL 3085032, at \*11 (W.D.N.Y. Nov. 4, 2025); *see also New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) ("Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.") (cleaned up). Petitioner was detained by ORR at twelve-years-old. Now thirteen, he has spent almost 500 days wrongfully detained by ORR. His lengthy detention and separation from the only family he has known is because of any arbitrary and capricious decision by ORR. He has suffered mental anguish and is showing signs of depression. Absent injunctive relief, continued separation and detention would cause further irreparable harm.

Likewise, the balance of equities and the public interest factors favor granting injunctive relief. Petitioner faces numerous hardships, namely deprivation of his liberty, deteriorating mental health, and continued separation from the people he considers his family. Any added burdens on the government—whether through the financial burden of organizing Petitioner's release or otherwise—are substantially outweighed by Petitioner's interests. Further, the public has a strong interest in ORR's accurate compliance with its statutory framework, Foundational Rule, and the UACB Policy Guide. In light of the Court's conclusion that the ORR acted arbitrarily and capriciously to deny Ms. Stenor's application, the Court finds that public interest is best served by releasing Petitioner into the custody of Ms. Stenor.

19

While the Court acknowledges the public's interest in ensuring the safety of minors in Government care, those concerns are alleviated here, in light of the extensive record of internal recommendations that Petitioner be released to his sponsor. Accordingly, the balance of equities and public interest factors both weigh in Petitioner's favor.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Motion is **GRANTED**. Petitioner shall be released into the custody of his next friend, Cleante Stenor, on or before **February 13, 2026, at 9:00 AM**. No bond is required for release. Given the logistical complexity of releasing Petitioner, the parties shall file a joint notice under seal on the docket no later than **February 9, 2026, at 5:00 PM** informing the Court of the plan for his release.

By **February 13, 2026, at 5:00 PM**, the Federal Respondents shall file a notice with the Court confirming that Petitioner was successfully reunited with his family. The parties shall also file a joint status report on **February 20, 2026**, appraising the Court of (1) M.S.'s current status and confirming, again, that he remains successfully reunited with his family; (2) any intended next steps, including whether Petitioner intends to withdraw the habeas petition or whether he seeks to transfer the instant case the U.S. District Court for the Southern District of Florida.

**SO ORDERED.**

Hartford, Connecticut
February 7, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

20